```
                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION AT CINCINNATI
```

**CIVIL ACTION NO. 1:13cv0520 (WOB-KKL)**

**EARNEST MCCOWEN, ET AL.**                              **PLAINTIFFS**

**VS.**

**VILLAGE OF LINCOLN HEIGHTS, ET AL.**                   **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

Two firefighters, Earnest McCowen and Jamil Turner, bring this civil rights action against their former employer, the Village of Lincoln Heights, and the Village Manager, Stephanie Summerow Dumas, alleging violations of the Ohio Fair Employment Practices Act and Title VII of the Civil Rights Act of 1964.  McCowen and Turner allege that the Village and Dumas unlawfully terminated them as a means of retaliating against their supervisor, former Fire Chief Michael Solomon, who sued and filed an EEOC charge against Defendants for sex discrimination and retaliation.  Defendants assert that Plaintiffs were terminated because they failed to obtain emergency medical technician ("EMT") certifications.

This matter is before the Court on Defendants' joint motion for summary judgment (Doc. 11).  The Court heard oral argument on Tuesday, October 7, 2014, and thereafter took this motion under submission (Doc. 19).  After further study, the Court now issues the following Memorandum Opinion and Order.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

**A. Plaintiffs' Employment History and Promotion to Part-time Firefighters**

Plaintiffs began their association with the Village of Lincoln Heights Fire Department as children. Doc. 10-3, Solomon Dep., at 14. McCowen's father formerly served as the Village Fire Chief; Turner's father was also a long-time firefighter. Doc. 10-1, McCowen Dep., at 15; Doc. 10-3, Solomon Dep., at 12. Plaintiffs claim that they grew up in the department, hanging around the fire house as young children while their fathers were on duty, and then becoming fire cadets as teenagers. Doc. 10-1, McCowen Dep., at 16-17; Doc. 10-3, Solomon Dep., at 14-15. The two completed a vocational firefighting program as part of their high school curriculum that culminated in their obtaining Ohio firefighter certificates in 2006. Doc. 10-1, McCowen Dep., at 13; Doc. 10-2, Turner Dep., at 6. In summer 2006, the Village hired Turner and McCowen as volunteer firefighters. Doc. 10-1, McCowen Dep., at 26-27.

Over the years, Plaintiffs developed strong relationships with Solomon and other firefighters who had worked with Plaintiffs' fathers. Solomon testified that he had known McCowen "since [McCowen] was born" and that the two associated outside of work (along with McCowen's father), including on fishing trips, dinners, and even a family trip to Gatlinburg, Tennessee. Doc. 10-3, Solomon Dep., at 10-11; Doc. 10-1, McCowen Dep., at 15-17. Solomon testified that although he did not associate often with Turner outside of work, he

had known Turner since Turner was a child and that he considered both Turner and McCowen to be "family." Doc. 10-3, Solomon Dep., at 14. Plaintiffs' close relationship with Solomon appears to have contributed to their promotion to part-time firefighters, effective January 1, 2012.[1] *See id.* at 62, 64-65; Doc 10-1, McCowen Dep., at 51.

According to Solomon, Plaintiffs' promotion resulted from a desire to have a third firefighter working on each shift so that the department could respond to fire calls without requesting assistance from volunteers or neighboring departments.[2] Doc. 10-3, Solomon Dep., at 62-63. Solomon testified that he approached the Village Council in early December 2011 about funding for the third firefighter and recommended promoting McCowen and Turner to work in that slot. *Id.* at 64.

McCowen and Turner's promotion caused some tension within the fire department. Concerns about their promotion were voiced at an Officers' Meeting on December 31, 2011, attended by Solomon, Assistant Chief Charles Thomas, several other firefighters, and Village Manager Dumas. *See* Doc. 12-2, Solomon Aff. ¶ 8; Doc.10-4, Scott Dep., at 25-26. These concerns centered on McCowen and Turner not being EMTs.

---

[1] The Village of Lincoln Heights does not employ full-time firefighters. *See* Doc. 12-3, Thomas Aff., ¶ 3. "Part-time" firefighters work regular shifts and are paid by the hour. Doc. 10-2, Turner Dep., at 13. In contrast, "volunteer" firefighters are called in as needed to respond to fire calls and are paid per run. Doc. 10-1, McCowen Dep., at 27.

[2] Ohio law requires a minimum of three firefighters to operate a fire truck. *See* Doc. 10-4, Scott Dep., at 27-28. The Village had previously operated two-man shifts, calling in volunteer firefighters to fill the third slot on fire calls. *See* Doc. 10-3, Solomon Dep., at 62.

*See, e.g.*, Doc. 12-3, Thomas Aff. ¶ 5; Doc. 10-5, Cortes Dep., at 19; Doc. 11-1, Holbrook Aff., ¶ 7.

Approximately ninety-percent of the Village's calls are for emergency medical services, which, by Ohio law, require two EMTs to respond. Doc. 10-3, Solomon Dep., at 19, 23. Some firefighters complained that if two firefighter-EMTs and one firefighter (such as McCowen or Turner) were on a shift, the two firefighter-EMTs had to respond to all emergency medical services calls; if three firefighter-EMTs were scheduled, they could more equally share the work. *See* Doc. 12-4, Appeals Board Hearing Tr., at 28; Doc. 10-1, McCowen Dep., at 39. In addition, some firefighter-EMTs thought it was unfair that firefighters were paid the same rate as firefighter-EMTs, despite going on significantly fewer runs. Doc. 12-3, Thomas Aff., ¶ 5. At the time of Turner and McCowen's promotion, one other part-time firefighter was not EMT certified. Doc. 10-1, McCowen Dep., at 34.

The December 31, 2011 meeting resulted in a recommendation that McCowen and Turner obtain their EMT certification, though the parties dispute whether certification was required or merely suggested. Defendants assert that McCowen and Turner were required to become certified within a year. Doc. 11-3, Dumas Aff., ¶ 3. Plaintiffs claim that certification was not required and no firm time limit was in place. Doc. 10-1, McCowen Dep., at 57. Solomon testified he did not recall an agreement that Turner and McCowen would become EMTs within a year but stated that he had told Plaintiffs "numerous times" that he would like them to get certified. Doc. 10-3, Solomon Dep., at

57. Captain Michael Scott testified that Solomon said during the meeting that he would like for Turner and McCowen to possibly be certified within a year, "[a]nd if they didn't have it within that year, he was going to pull them off the schedule until they . . . got their certifications," allowing them to work only as volunteers. Doc. 10-4, Scott Dep., at 28-29. Thomas also testified to this agreement, stating that it was "not a formal condition of their hire, but a tool with which Mr. Solomon and I had agreed to push [Plaintiffs] to pass the certification exam." Doc. 12-3, Thomas Aff., ¶ 7; *see also* Doc. 10-6, Thomas Dep., at 38. Thomas averred that he notified Plaintiffs about the agreement the day after the meeting. Doc. 12-3, Thomas Aff., ¶ 7.

Plaintiffs admit that following the December 31, 2011 meeting, they understood that the Village wanted them to get certified and testified that Solomon and other officers "pushed" them to get certified, recognizing that certification would help them better their careers and enable them to respond to more calls.[3] *See* Doc. 10-2, Turner Dep., at 19, 39, 42 (stating that he and McCowen agreed to

---

[3] Plaintiffs also admit that they knew the Village wanted them to become EMTs because the Village paid for them to enroll in an EMT course in 2009. Doc. 10-1, McCowen Dep., at 19; Doc. 10-2, Turner Dep., at 12. Plaintiffs completed that course but did not pass the state certification test. Doc. 10-1, McCowen Dep., at 19-20; Doc. 10-2, Turner Dep., at 9-11. Although Plaintiffs could have retaken the test twice, Plaintiffs did not do so, citing an inability to pay for additional tests. Doc. 10-1, McCowen Dep., at 19-20. Plaintiffs also took an EMT course in 2006 as part of their high school curriculum. *Id.* at 21; Doc. 10-2, Turner Dep., at 7. Turner completed all course requirements and took the certification test, but failed. Doc, 10-2, Turner Dep., at 7-8. McCowen did not complete the course and did not take the test. Doc. 10-1, McCowen Dep., at 21.

become certified); Doc. 10-1, McCowen Dep. at 30-31, 56-58 (stating that he understood the fire leaders' suggestion to mean, "[I]f I wanted to do this job, I've got to get my EMT").

**B. Solomon-Dumas Dispute**

Around the time of Plaintiffs' promotion, a dispute between Chief Solomon and Village Manager Dumas emerged, resulting in Solomon filing suit on February 22, 2012, in the Ohio Court of Common Pleas against the Village and Dumas. Doc. 12-2, Solomon Aff., ¶ 10. According to Solomon's complaint in that suit, which accused Dumas of sexual harassment and unlawful retaliation, Solomon notified the outgoing mayor of his allegations against Dumas in December 2011 and sent a letter to the new mayor restating the accusations in early January 2012. Doc. 12-2, Complaint, ¶¶ 7-9. A meeting with Dumas was scheduled for January 18, 2012, to discuss the allegations. *Id.* ¶ 9.

Although other firefighters knew of the dispute, Solomon testified that they generally stayed out of it. Doc. 10-3, Solomon Dep., at 73-75. McCowen testified that he and Turner sided with Solomon but states that he "didn't do anything" to show that he was backing Solomon and never talked with Dumas about his support for Solomon. Doc. 10-1, McCowen Dep., at 50. Turner testified that he never told Dumas that he sided with Solomon but that he thought she must have heard through word of mouth. Doc. 10-2, Turner Dep., at 27. Both Plaintiffs testified that their close relationship with Solomon (especially Solomon's vouching for them in the promotion process)

would have indicated to Dumas that they were on his side. Doc. 10-1, McCowen Dep., at 51; Doc. 10-2, Turner Dep., at 29.

**C. Plaintiffs' Efforts to Obtain EMT Certification During 2012**

Plaintiffs' first opportunity to enroll in an EMT course following the December 31, 2011 Meeting was January 2012. Doc. 10-1, McCowen Dep., at 29. Plaintiffs did not enroll in the course because they could not afford the tuition (approximately $820 at the time). *Id.* at 29-30, 32; Doc. 10-2, Turner Dep., at 22. Having saved the tuition money, Plaintiffs attempted to enroll in the June 2012 EMT course at Scarlet Oaks. Doc. 10-1, McCowen Dep., at 29. However, the instructor canceled the course due to insufficient enrollment. *Id.* Plaintiffs testified that the instructor said he would try to work them into another class but that they did not follow up with the instructor after he failed to return their initial call. *Id.;* Doc. 12-4, Appeals Board Hearing Tr., at 16. Plaintiffs planned to enroll in the January 2013 EMT class at Scarlet Oaks and notified Solomon and Thomas of their plans. Doc. 10-1, McCowen Dep., at 33. McCowen claims that their supervisors told them to be sure to register for the January 2013 class.[4] *Id.* at 33-34.

---

[4] Defendants emphasize that there were numerous other locations in the Greater Cincinnati area where Plaintiffs could have enrolled in an EMT course. Plaintiffs testified that these locations were too far away, too expensive, or incompatible with their work schedules, and that they were unaware of some of the programs. *See generally* Doc. 10-1, McCowen Dep. at 28-32; Doc. 10-2, Turner Dep., at 20-22.

**D. Plaintiffs' Termination**

On October 29, 2012, Solomon delivered to McCowen and Thomas a letter from Dumas stating that the two were terminated for failing to obtain their EMT certification. Doc. 10-1, McCowen Dep., at 71. Dumas stated that she learned on or about that date that McCowen and Turner were not in position to obtain their certification before the end of 2012, given the time required for the course and testing. Doc. 11-3, Dumas Aff. ¶¶ 5-6. At the time of Plaintiffs' termination, all of the Village's other part-time firefighters were EMTs.[5] Doc. 10-1, McCowen Dep., at 35; Doc. 10-2, Turner Dep., at 20; Doc. 10-3, Solomon Dep., at 25-27.

Shortly after being notified of their termination, McCowen and Turner sent Dumas a letter requesting additional information about the reasons for their termination. Doc. 10-1, McCowen Dep., at 64. Dumas did not respond to this letter. *Id.* at 70. McCowen and Turner appealed the decision and a public hearing of the Village's Personnel and Appeals Board occurred on November 19, 2012. *See generally* Doc. 12-4, Hearing Tr. The Board upheld McCowen and Turner's termination.[6] Doc. 10-1, McCowen Dep., at 63.

On May 1, 2013, Plaintiffs filed an EEOC charge against the Village alleging retaliation. Doc. 1, Complaint, ¶ 16. Plaintiffs

---

[5] The other non-EMT part-time firefighter had resigned in July 2012 to relocate. *See* Doc. 10-1, McCowen Dep., at 34-35.
[6] Notably, during the Appeals Board Hearing, Dumas stated that if McCowen and Turner were to obtain their EMT certification she would be open to rehiring them. Doc. 12-4, Hearing Tr., at 145-46.

filed this suit on July 25, 2013. *Id*. Defendants moved for summary judgment on June 30, 2014. Doc. 11.

## II. ANALYSIS

### A. Summary Judgment

Summary judgment is appropriate when there exists no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A court "must consider 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Rouster v. Cnty. of Sagniaw*, 749 F.3d 437, 446 (6th Cir. 2014)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). In determining whether there is a genuine dispute as to a material fact, "we interpret the facts and draw all reasonable inferences therefrom in favor of the nonmoving party." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B. Retaliation Claim

Title VII's antiretaliation provision makes it unlawful for an employer to discriminate against an employee "because he has opposed" an unlawful employment practice or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" regarding an unlawful employment practice. 42 U.S.C. § 2000e-3(a). Similarly, Ohio law makes it unlawful for "any person to discriminate in any manner against any other person because that person has opposed any unlawful

discriminatory practice." Ohio Rev. Code Ann. § 4112.02(I). Courts interpret Ohio's antiretaliation law using the same analytical framework as Title VII. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

A plaintiff may establish unlawful retaliation either by introducing direct evidence of retaliation or by offering circumstantial evidence that would support an inference of retaliation. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013) (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010)). Claims based on circumstantial evidence are analyzed using the *McDonnell Douglas/Burdine* burden-shifting framework. *Fuhr*, 710 F.3d at 674.

Under this framework, a plaintiff has the initial burden to establish a prima facie case of retaliation by showing: (1) plaintiff engaged in activity protected under Title VII; (2) plaintiff's exercise of his or her protected rights was known to defendant; (3) an adverse employment action was subsequently taken against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse employment action. *Id.* The plaintiff's burden at this stage is "not onerous, but one easily met." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002).

Upon establishing a prima facie case, the burden of production shifts to the defendant to rebut the presumption of unlawful retaliation by offering "some legitimate, nondiscriminatory reason for its action." *Fuhr,* 710 F.3d at 674-75 (quoting *Spengler*, 615 F.3d at

492). If the defendant produces such a reason, the burden of production then returns to the plaintiff to show by a preponderance of the evidence that the defendant's proffered reason was a mere pretext for discrimination. *Id.* at 675. Despite these shifts in the burden of production, the ultimate burden of persuasion always remains with the plaintiff. *Id.*

**1. Third Party Reprisals under *Thompson***

In *Thompson v. North American Stainless LP*, 131 S. Ct. 863 (2011), the Supreme Court established an exception to the general rule requiring Title VII plaintiffs to show that they *personally* engaged in protected activity. *Thompson* involved an employment dispute where Thompson, the petitioner, was fired after Regalado, his fiancée, filed a sex discrimination charge against their employer, North American Stainless. Thompson subsequently filed his own charge and lawsuit under Title VII, alleging that North American Stainless fired him as a means of retaliating against Regalado.

In *Thompson*, the Supreme Court addressed two questions: (1) Whether terminating Thompson constituted unlawful retaliation in violation of Title VII, specifically whether the termination constituted an "adverse employment action" against Regalado; and (2) Whether Title VII grants Thompson a cause of action, specifically whether Thompson is a "person aggrieved" for Title VII standing purposes.

Addressing the first question, the Court accepted that Regalado's sex discrimination charge constituted protected activity and assumed

-11-

that a causal link existed, instead focusing on the second element: whether terminating Thompson was the type of employer conduct intended to be covered by Title VII's antiretaliation provision. Citing its decision in *Burlington North & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Court explained that the antiretaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." *Thompson*, 131 S. Ct. at 868. Instead, the provision "prohibits any employer action that 'well might have dissuaded a *reasonable* worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington*, 548 U.S. at 68).

The Court found it "obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired." *Id.* But the Court "declined to identify a fixed class of relationships for which third-party reprisals are unlawful," stating only that it expected that "firing a close family member will almost always meet the *Burlington* standard, and inflicting a milder reprisal on a mere acquaintance will almost never do so . . . ." *Id.* Thus, determining whether an employer's actions toward a third party constitute a "materially adverse" action against the complainant requires analysis of both the relationship between the complainant and the third party and the nature of the act or threat.

As to whether Thompson had standing to sue, the Court adopted the "zone of interests" test, holding that Title VII "enabl[es] suit by any plaintiff with an interest 'arguably [sought] to be protected by the statute,' while excluding plaintiffs who might technically be

injured in an Article III sense but whose interests are unrelated to the statutory prohibitions in Title VII." *Id.* at 870 (internal citation omitted).

Applying the test, the Court found that because "the purpose of Title VII is to protect employees from their employers' unlawful actions" and because Thompson was an employee, he falls within the zone of interests protected by Title VII. Moreover, the Court noted that Thompson was "not an accidental victim" but rather "[h]urting him was the unlawful act by which the employer punished Relegado." *Id.*

*Thompson*, in essence, allows a plaintiff to use the protected activity of a closely related individual to satisfy the first element of a prima facie retaliation case.

### 2. Prima Facie Case

Although Plaintiffs initially alleged that they had engaged in protected activity by "siding" with Solomon in his dispute with Dumas, at oral argument, Plaintiffs clarified that they are advancing only a third-party reprisal theory and no longer claim that they personally engaged in protected activity. Instead, their sole claim is that Defendants terminated them as a means of retaliating against Solomon, with whom they shared a close relationship.

Plaintiffs have satisfied the first two elements of a prima facie case as it is undisputed that Solomon engaged in protected activity by filing an EEOC charge and lawsuit alleging discrimination, and that Defendants were aware of this protected activity.

The question of whether Plaintiffs' relationship with Solomon is the type of relationship *Thompson* intended to cover, and thus, whether their termination constitutes an adverse action against Solomon, appears to be one of first impression in this circuit. Though the Sixth Circuit has suggested that a plaintiff in a romantic relationship with a person engaged in protected activity may qualify, *see, e.g., Rodriguez-Monguio v. Ohio State Univ.*, 499 F. App'x 455 (6th Cir. 2012), no court in our circuit has considered whether *Thompson* covers friendships or relationships between coworkers.

It is not necessary to address this interesting issue in this case, because Plaintiffs have not adduced probative evidence that any retaliatory motive was the "but for" cause of their termination. For purposes of summary judgment, however, the Court will draw the inference in Plaintiff's favor and assume that Plaintiffs have established the third element of their prima facie case.

A plaintiff establishes the fourth element -- a causal connection -- by proffering "evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Fuhr*, 710 F.3d at 675 (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009)). Plaintiffs assert that their termination was one of several retaliatory acts against Solomon that followed soon after his protected activity and continued during the pendency of his lawsuit. *See, e.g.*, Doc. 12-2, Solomon Complaint, at 11 (describing a suspension and other disciplinary actions taken by Dumas after Solomon filed his lawsuit); Doc. 12-3, Thomas Aff., ¶ 9 (discussing Dumas's

-14-

treatment of Solomon after he filed suit). Drawing all inferences in Plaintiffs' favor, and recognizing that plaintiffs are to face a low bar in establishing a prima facie case, the Court finds that this evidence is sufficient to establish a causal connection between Solomon's protected activity and the adverse action.

### 3. Pretext and Causation

Because Plaintiffs have set forth a prima facie case, the burden shifts to Defendants to offer a legitimate, non-discriminatory reason for Plaintiffs' termination. Defendants contend that McCowen and Turner were terminated because they failed to obtain EMT certification, thereby shifting the burden back to Plaintiffs to show pretext. In assessing the proffered reason, the Court notes that, ultimately, Plaintiffs must demonstrate that the desire to retaliate against Solomon was the "but-for" cause of their termination. *See Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (establishing a more exacting "but-for" causation standard for Title VII retaliation cases); *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (acknowledging the standard).

This is a burden Plaintiffs simply cannot meet. Under *Nassar*, it is not enough that Plaintiffs prove that retaliation against Solomon was *one* of the factors motivating their termination. *See Nassar*, 133 S. Ct. at 2544 (Ginsburg, J., dissenting) (explaining that under the majority's holding, "proof of a retaliatory motive alone yields no victory for the plaintiff"). Instead, Plaintiffs must prove that retaliation was the *only* factor motivating their termination.

Plaintiffs cannot meet this burden because even if a jury were to find that Defendants desired to embarrass Solomon by terminating Plaintiffs, no reasonable jury would disregard the substantial evidence that Plaintiffs' failure to obtain their EMT certifications also motivated their termination.

Although the parties dispute whether a strict one-year time limit to become EMT-certified was in place, Plaintiffs admit that they "agreed" they would become certified. *See* Doc. 10-2, Turner Dep., at 42. Both Plaintiffs testified that they knew the Village and their fire department superiors wanted them to become certified. *See* Turner Dep. at 19, 39; McCowen Dep. at 30-31, 56-57. Moreover, both Turner and McCowen testified to a Village policy implemented in 2010 that required all new hires to be certified as both firefighters and EMTs.[7] Doc. 10-1, McCowen Dep., at 69; Doc. 10-2, Turner Dep., at 13.

Likewise, the parties do not dispute that a firefighter who is also EMT-certified is more "versatile" and that the vast majority of the Village's calls are for emergency medical services, which require EMTs to respond. Further, it is undisputed that no other part-time firefighter working at the time of McCowen and Turner's termination lacked EMT certification.

---

[7] Although Plaintiffs deny the existence of this policy in their Response, Doc. 12, at 17, because both McCowen and Turner admitted its existence during their depositions, the Court does not consider it a disputed fact. Plaintiffs stated that they were not considered "new hires" when they were promoted because of their prior service as volunteers and thus were not subject to the policy. Doc. 10-1, McCowen Dep., at 68. Additionally, all neighboring departments required "on-the-clock" firefighters to be EMTs. *See* Doc. 10-1, McCowen Dep., at 66-67.

Moreover, there is evidence that the controversy over McCowen and Turner's promotion to part-time firefighters arose independently of the sexual harassment conflict between Dumas and Solomon. Solomon admits that other firefighters were upset about Plaintiffs' lack of EMT certification and further admits that their complaints were the impetus for the December 31, 2011 Officers' Meeting, where the certification requirement discussion occurred. *See* Solomon Aff. at ¶ 8. At that time, although animosity between Dumas and Solomon was brewing, Solomon had not yet filed his EEOC charge or his sexual harassment lawsuit. *See* Doc. 12-2, Solomon's Complaint, at 5. Rather, Solomon averred that he did not disclose his sexual harassment allegations to Dumas until January 5, 2012.[8] *Id*. at 6.

This undisputed evidence prevents a reasonable jury from concluding that Solomon's protected activity was the but-for cause of Plaintiffs' termination. Thus, summary judgment for Defendants is appropriate.

### III. CONCLUSION

Therefore, having heard the parties and the Court being sufficiently advised,

---

[8] While there is some evidence that Dumas and Solomon were in conflict prior to the December 31, 2011 Officers' Meeting, it is unclear whether this conflict related to protected activity or was simply a personal dispute. Thus, the Court relies on statements made by Solomon in his sworn complaint and does not speculate as to the basis of any conflict occurring prior to January 5, 2012.

**IT IS ORDERED** that:

(1) The joint motion for summary judgment by Defendants the Village of Lincoln Heights and Stephanie Summerow Dumas (Doc. 11) be, and is hereby, **GRANTED**, and all of Plaintiffs' claims be, and are hereby, **DISMISSED WITH PREJUDICE**; and

(2) A separate judgment shall enter concurrently herewith.

This 17th day of December, 2014.



Signed By:
*William O. Bertelsman* WOB
United States District Judge